Mr. Chief Justice, and may it please the Court. This Court should not expand Bivens for the first time in 40 years. First, Bivens extensions clash with modern precedents. Bivens interpreted federal courts' jurisdiction over federal questions, thus authorizing courts to fashion new damages actions. Decades of intervening cases reject that premise and remove any doctrinal basis for Bivens extensions. Second, this Court has held that any reason to think Congress might doubt the efficacy or necessity of a damages remedy bars new Bivens actions. Abbasi and Hernandez make respect for the separation of powers the key consideration, but the Constitution vests Congress alone with the power to create damages actions. Abbasi and Hernandez say courts must pause if the judiciary isn't well-suited to assess the systemic costs and benefits of a new damages action. But courts are never equipped for such predictive, empirical judgments. Abbasi and Hernandez also rule out Bivens extensions if Congress has extensively legislated in an area. But Congress has extensively legislated about federal officer liability without allowing individual damages actions. Third, at the very least, this Court should not expand Bivens to First Amendment retaliation claims or to Fourth Amendment claims involving border security. Those claims raise yet further grounds for pause and would explode the universe of Bivens claims. For First Amendment retaliation claims, plaintiffs could portray virtually any governmental action as unconstitutional if taken for retaliatory reasons, creating especially amorphous Bivens liability. Further, allowing First and Fourth Amendment claims against agents involved in border security also implicates national security, as Hernandez recognized. And finally, there are many alternative means to protect these constitutional interests. I welcome the Court's questions. Well, Ms. Harris, when you have the Fourth Amendment claim in Bivens, it's similar to the Fourth Amendment claim here. So why doesn't that foreclose your argument that that's excluded? We respectfully disagree. The Fourth Amendment claim in Bivens is quite different from the claim here for a number of reasons. First of all, the class of defendants and the statutory mission of the officers is exceedingly different. The Federal Bureau of Narcotics mission is not the same in any respect as the statutory mandate under which border patrol officers are operating, and that is an important factor under Abbasi for a new context. And on top of that, we know, because Congress and the Court have said so, that the Fourth Amendment applies differently in a border context. And that, I think, also goes to the border patrol functions. Border patrol agents are in dangerous circumstances every day, trying to interdict terrorists, smugglers, illegal entry and exit of foreign nationals. Couldn't you say something similar to that about police officers in the Fourth Amendment? I mean, it seems to be pretty much the same thing. Beyond that, though, if the Court adopted your approach, what survives as far as Bivens claims go? What survives is what we think the Court recognized in Abbasi would survive. So the Court said in Abbasi that it is not questioning the necessity or the stare decisis value of Bivens in the search and seizure context in which it arose. And I think the next paragraph of Abbasi illustrates the Court was distinguishing between claims that would not be a new context for Bivens and claims that would be. So, again, I think if you look at the facts of Bivens and the things that perhaps the DEA is doing today, that would absolutely survive. I don't think you have to resolve exactly what is or is not a new context, because this case, I think, is really about what happens when there is a Bivens extension on the table, when there is something that is absolutely a new context, and what factors should courts be considering in order to resolve that question. Well, what is so different? This was a search of somebody, an unlawful search on private property. I mean, it was near the Canadian border. Okay. The guy was a border agent. Well, that doesn't seem to be particularly relevant to whether the other fellow was subject to an illegal search on his private property. Well, I think there are two really important things that are missing from that sort of picture of it. One of which is that I think everyone agrees that Agent Egbert was involved in the immigration investigation, and that was the whole reason for being on Mr. Bully's property, which, again, was a notorious site of smuggling and illegal entry and exit. So the fact that the border patrol agent was indeed exercising... So they have more flexibility under the Fourth Amendment than a regular police officer, you know, in Des Moines? Yes. And I think under both the court's precedents and what Congress has said, that is absolutely the case. So the court's Montoya decision recognizes the Fourth Amendment does apply differently at the border. And Section 8 U.S.C. 1357 is Congress's recognition that in the border context, there are a lot of different warrantless searches, arrests, etc., etc., that can happen at the border that you would not have in Des Moines. And I think all of that's important because this goes to what the court said in Hernandez with respect to the conduct of agents stationed at the border inherently implicates national security. So it's absolutely true of Agent Mesa and Hernandez, and I think applies equally here because the court in Hernandez was talking about the kinds of functions border patrol agents are performing at the border, which again involves... He was a border patrol agent, but it's not... We don't have this sort of Fourth Amendment free zone around the border. That's correct. I think you have to tie it, obviously, to the officer's functions. So if we were talking about, you know, an IRS agent who happens to be stationed at the border, there might be different issues with a Bivens claim in that context, but we wouldn't be saying just because the IRS agent is at the border means they can, you know, they are entitled to flexibility. I thought that the issue here was excessive force. And I thought that the person making the claim was a U.S. citizen. And in Bivens, it was an excessive force claim in a private home. Here it's an excessive force claim on the property of an inn owned by a U.S. citizen. I understand that customs regulations require agents to secure warrants absent exigent circumstances, and we can debate whether this was exigent circumstances justifying his entry into this home and his decision to do what he did. I'm not going to get into those details. But I go back to Justice... the Chief's question, which is, in what ways does the Fourth Amendment... not the Fourth Amendment's excessive force claim differ between law enforcement agents like narcotics agents, alcohol and tobacco and firearm agents or border patrols? I thought that none of them constitutionally can use excessive force. Justice Sotomayor, I think there are a couple of reasons... Let's just answer that question. Can any of them use excessive force, being defined as force greater than that necessary? No, of course excessive force is something the Fourth Amendment prohibits, but I think that is not quite the inquiry when you're thinking about what is a new context or what are special factors, because we also... I understand what you're saying, it's customs agents, but I don't understand how they don't have the same constitutional protections that officers have, qualified immunity. So there's nothing that we've already said in Wilson v. Sellers that in a Bivens claim qualified immunity exists. So they have the right to use their reasonable judgment and not engage in constitutional conduct. I don't understand why this is a new context. So two points there. First of all, with respect to why this is a new context, I think the Abbasi factors are very clear, that a statutory mandate and a different level of judicial guidance makes the claim meaningfully different. And with respect to excessive force claims of the border, both Congress and the court have recognized that the need for lethal force in certain circumstances and the rules of engagement are fundamentally different. That's not this case, is it? Well, I think it is relevant to this case, just for the same... I mean, I'm not saying it isn't relevant. I just said this isn't a case where they're having special rules. This isn't a case where they're right at the border. This is a case of, you know, what the Chief Justice said. Okay, there are 83, I gather, the Bureau of Justice Statistics says there are 83 different agencies where the officers are federal, they're authorized to make arrests, they carry firearms, they provide police protection as their primary function. And I take it you think that Bivens still applies in Shasta County, California, doesn't it? I think it would depend on... No, no, no. It depends on whether it applies. It's exactly the same as the Bivens case. It's Shasta County, California. It's not New York. Apply? Yes. Of course. And you think it applies in April and May of this year, even though Bivens didn't take place in April and May? Yes. Okay, fine. And now which of these 83 agencies does it not apply to? So I think the question under Abbasi is, what is the statutory mission... And one of the missions with these people is they often fly in helicopters to help keep the peace with others who are just ordinary policemen or FBI men. Well, I mean, I was going to ask you, what do you think about the Federal Bureau of Prisons, the police there? Does it apply there? The Federal Bureau of Prisons? I think probably not because there's statutory... No Bivens in the Federal Bureau of Prisons. Okay, even though... What about the Federal Bureau of Investigation? Does it apply there? I think it likely is a new context, and the reason is the Abbasi... Not the Federal Bureau of Investigation. Bivens doesn't apply to FBI agents. Is that what you're saying? I'm saying it's a new context. You'd have to run special factors. And the reason for that is I think it's a faithful application of Abbasi because the statutory mission... All right, I'm just getting your point of view. And what about the Drug Enforcement Administration? So the question for the DEA is that is a successor agency to the Federal Bureau of Narcotics. And again, I think you have to run through the Abbasi factors. I get it. I'll give you two more. Bureau of Alcohol, Tobacco, Firearms, and Explosives. In your opinion, is it obvious that it does apply there? Not obvious? Or we go through some mechanism? I think you apply Abbasi. Not obvious. Because again, the question has to do... Last one, U.S. Mint Police. I actually don't know what the U.S. Mint Police does, but I suspect it's important so people don't take all the gold out of Fort Knox or something. But do the same thing. Does it apply? Obviously not apply. By the way, if I wanted to, which I don't because my colleagues would lynch me, I could go through 78 more. And what they have in common, they carry firearms, they provide police protection, they're authorized to make arrests. But you're saying that isn't enough? I'm saying that's not enough because grouping all 83 federal agencies together when they range from the Secret Service, which has obviously a primary mission to other law enforcement agencies, is not only new, but raises really hard questions for courts that I don't think courts are equipped to consider under Abbasi. Ms. Harris, can I follow up on just as far as questions? Is your inquiry driven by the mission of the agency or the mission of the federal officer in the particular situation? So for example, would your position change if here, Edward had gone in because he just suspected that there had been a domestic dispute and he was helping out local law enforcement and he went in? Is what matters the fact that he is a Border Patrol agent? Or is what matters that when he went in, he was investigating the potential smuggling? So I honestly think it's both because Abbasi seems to be looking at both the class of defendants, the implications for the agency, and also the statutory mandate under which the officer is operating. And I say that because in a lot of circumstances, it's going to be difficult to sort of separate out in one particular instance, which exactly are, you know, is there an overlapping sort of statutory mandate an officer is executing? And I think that also goes to the special factors analysis in the sense that one of the ultimate questions is, are courts well-equipped to figure out the costs and benefits government-wide? So in my hypothetical, where the border agent, where Edward goes in and he's not investigating a border issue, but he's investigating a domestic dispute or, you know, an assault or something like that, kind of following up on Justice Breyer's hypotheticals or questions to you, would Bivens apply in that circumstance? I don't think so. I think you could certainly argue the national security implications might be different in that case, but I would still be arguing that Bivens does not apply in that circumstance for all the other special factors I've mentioned. And I would like to also flag alternative remedies are really important in this context. Again, the court's test is, is there any single reason to doubt the need, to think Congress would doubt the need for a Bivens remedy? And in your particular context, the Border Patrol agent is still going to be someone where there is the possibility of Federal Tort Claims Act liability and a whole raft of administrative remedies and other potential outlets for someone to vindicate their interest in making sure their constitutional rights aren't violated. Sorry. So other than the alternative remedies, your answer to Justice Barrett's question is sort of across the board, Bivens doesn't apply to Border Patrol agents. And if I could just hear again why that is, what do you think the special factors are that make all Border Patrol agents in every context doing any function different? Sure. I think it's a mix of things. Now, again, I think it's easiest at the border where the national security implications, I think Hernandez has already recognized. But you would extend it even if the Border Patrol agent was not at the border? Yes. And that is correct. And that is because I think the cross-cutting reasons against Bivens extensions make it a very difficult sell. So again, what are those reasons? Happy to go through them. First of which is just the doctrinal foundation. So is there reason to doubt, to think Congress wouldn't want a remedy in which there is a separation of powers violation? Well, but that just begs the question. I mean, why would Congress, I mean, the question is like, what's different about this very large class now that you are demarcating? Sure. And I think the second question is whether the judiciary is well-suited to weigh the costs and benefits for the cross-cutting effects on the Border Patrol and recognizing such claims, including whether Border Patrol agents are sort of implementing overlapping functions. Sort of at one moment, perhaps they think a search is initially perhaps something more akin to a routine law enforcement search. If it comes to immigration enforcement action, I think there are pretty hard questions. I mean, but don't all law enforcement officers, you know, they do what's needed. And sometimes they're going to do something that's not strictly in the wheelhouse. And sometimes they're going, I mean, that would apply to everybody, wouldn't it? You know, there's just a cop on the beat and he might be doing Border Patrol someday too. I think it's particularly acute with respect to the Border Patrol. But I do think that this illustrates, again, the level of generality that Abbasi and Hernandez have now pitched the inquiry, which is really separation of powers concerns have to be at the absolute forefront. And is the answer to the question, are courts ever well-suited to figure out the systemic costs in an agency, including morale, deterrent effect, and ministry of costs? Well, with respect, it does seem like, you know, when Justice Breyer was a little bit making fun of this, like, you know, on Tuesday and Thursday, but not Wednesday and Friday. I mean, it seems that that's what you're saying, that we sort of focus Bivens at this unbelievably minute level of detail and find out exactly what Bivens was about and say, oh, sorry, it doesn't apply because it's Tuesday rather than Monday or it's April rather than May. Well, I respectfully disagree with that. I do think we're trying to faithfully apply exactly what Abbasi says. So I think the question is, how do you distinguish between trivial differences and differences that are meaningful from Bivens in which, again, we're not challenging the stare decisis and settled law value of Bivens? And so I think that question really is answered by the Abbasi new context inquiry, which the court has said is broad and easily satisfied. And so I think that has to be the answer in order to be faithful to what the court has already said in this context. Thank you, counsel. Justice Thomas, Justice Breyer, anything further? Justice Alito? Justice Gorsuch, anything further? Justice Barrett? Thank you, counsel. Mr. Hewson? Mr. Chief Justice, and may it please the court, the straightforward application of this court's recent Bivens precedence demonstrates that the judgment of the Court of Appeals should be reversed. At step one of Abbasi's framework, both of respondents' claims would require extending Bivens to new contexts for the first time in 40 years. And at step two, multiple special factors counsel hesitation against the court taking that momentous step. On the First Amendment, this court has explained that retaliation claims are easy to allege and hard to disprove, and that they have the potential to chill federal officers' performance of important functions. That is especially true here, where respondents seek to impose liability for Agent Egbert's giving of a tip to another agency suggesting further investigation. And on the Fourth Amendment, respondents' claim is meaningfully different from the ones in Bivens in ways that bear directly on the separation of powers. This court has recognized that agents' effective policing of the border has a clear and strong connection to national security, and Congress has also determined that law enforcement at the border is different from other kinds of law enforcement. All those features give ample reason to doubt that Congress would have wanted an individual damages remedy in the circumstances here. Following up on the questions that Ms. Harris was confronted with, do you think that there is a meaningful difference between Border Patrol agents and narcotics agents? I think that Border Patrol agents do present a new context, Your Honor, at step one of Abbasi. But I think whether special factors counsel hesitation, and thus whether a Bivens claim can go forward, depends on what the Border Patrol agents are doing. So I think this goes directly to the question that Justice Barrett posed about what about a situation where a federal officer performs some duties that do implicate national security and others that don't. We do think that that makes a very important difference. And we think that the facts here present a very clear and strong connection to national security, similar to what was at issue in Hernandez. That's why a Bivens claim cannot go forward here. We think the case would be different if you had a Border Patrol agent who's just assisting with local law enforcement to perform routine law enforcement functions. After 9-11, there were quite a few local policemen, I believe, as well as FBI agents and federal police in New York City looking for terrorists, which is certainly a national law enforcement function. So is it the position of the Solicitor General and the government that if any of those normal agents that fall under Bivens, FBI, I take it, ordinary police, etc., federal police officials, if they had beaten somebody over the head unreasonably and acted contrary to the Constitution, there would be no Bivens action? Yes, there would be no Bivens action. So Bivens is not simply – I'd never heard of that one. But you're saying that just – who are the most ordinary people that Bivens applies to? I thought FBI agents. I think it is FBI. I thought DEA agents, too. I was wrong about that? There are many claims brought against – there are some claims brought against DEA agents. I thought alcohol, tobacco, and so forth. I thought those were just right at the heart of Bivens. Okay, so now they have the same job, basically, if you look at it in terms of arresting people for violations of federal law. They have the same authority to carry weapons. They have the same – whatever – they have the – what's the word? They have the same basic obligation providing police protection. But you are saying all those people to whom Bivens now applies, if the person they are arresting is a person who has a connection with, let's say, foreign dubious groups abroad, no Bivens action? Yes, that's right, Your Honor. Would you call that an extension of Bivens or a drawing back of what people thought Bivens was about? I think Abbasi explained that when an officer is operating pursuant to a different statutory or legal mandate, that does give rise to a new context. Oh, no, this is the same mandate, the FBI, the same mandate, the DEA. They see a person walking down New York City with a bomb, okay? And so they arrest him. And in the course of that arresting him, they do something shocking or contrary to the Constitution. That person with the bomb is connected with somebody in a foreign country. And you're saying that person with the bomb has no Bivens action. That's correct, Your Honor. I think that's illustrated by the court's opinion in Abbasi where the court talked about the difference between conditions of confinement claims like the ones that were at issue in Carlson and confinement claims like the ones that were at issue in Abbasi. And the court said the key difference is that Abbasi was a case about national security dissension. And that made all the difference even though at one level of generality. And how is this a case about national security? I mean, Justice Breyer gave you one hypothetical, but this is a much more prosaic case. I mean, the agent goes in and goes on to somebody's private property, and essentially it's to check on the status of a guest, the immigration status of a guest. Are you legally in this country or not? I mean, what does that have – you know, sure, borders have something to do with national security. But every time a border agent checks on immigration status of a person, we kind of wave our arms and say national security and say there's no Bivens remedy because of that? Your Honor, the court in Hernandez said that the protection of the border, the prevention of the unlawful entry of persons and drugs and other contraband has a clear and substantial connection to national security. I mean, Hernandez is a very different kind of case, right? It's a cross-border shooting. You know, it clearly had implications for the relationship between the United States and Mexico. You know, so whatever you think of Hernandez, there obviously was a dissent in that. But, you know, assume that the majority was right. This is not Hernandez, is it? I agree that there's a factual difference. The cross-border aspect of Hernandez, which was important to the analysis, is not present here. That's certainly true. But I might just say two things about why I think there are other features of Hernandez. Canada is not going to much care whether this border agent went on to, you know, checked out this guy's citizenship or legality in this country. Your Honor, I very respectfully but very vigorously disagree with that. The agents who work at the border in Blaine will tell you that their most important partnership is with the Royal Canadian Mounted Police. We work together with them to police our shared border. They protect their side for our benefit. We protect our side for their benefit. And it's that mutual cooperative relationship, which involves daily type of liaising, that really is what enables us to protect the border. So I do think that if you have a situation like the one that Hernandez was concerned about, where the prospect of Bivens liability chills border agents in performance of their duties, that is something that affects Canada in a very real way. It means more people are sneaking across the border into Canada. But it's not just about preventing people from going into Canada. Agent Egbert was on the property that day because the Turkish guest had undertaken objectively suspicious travel across the world to stay at a rundown bed and breakfast at a site that is notorious for cross-border smuggling. Again, the agents who deal with this property, it is a constant headache. They've had years where there have been multiple incidents per week of people coming across the border into the United States from Canada. And the agent suspected that day that that's why the Turkish guest was there, to facilitate the unlawful entry of persons or drugs or other things across the border into the United States or potentially to smuggle himself or other people. But this is a summary judgment motion where we take the facts, not as the agent says, right? And and if you do that, all that this is, is an unremarkable check as to whether a guest was lawfully in the country. I think we're happy to take the facts in the light most favorable to respond in. But again, the Fourth Amendment, it creates an objective standard of reasonableness. And I think the facts here gave ample reason for an objective suspicion that this guest was involved in cross-border smuggling activity. And again, I think Hernandez said that cross-border smuggling activity, preventing the unlawful entry of persons and drugs has a clear and substantial connection to national security. I think the court was exactly right about that. And for the reasons I mentioned, I also think that agents' effective performance of their duties at the border does make a very significant difference to our foreign partners, to our Canadian partners. Mr. Houston, give me a hypothetical case where your office would say Bivens permits a cause of action. Sure, Your Honor. In a case involving an FBI agent or an agent of the Park Police or the Marshals Service, something other than the Federal Bureau of Narcotics or its successor, the DEA, but that is a routine domestic search and seizure claim or a excessive force claim, the government has not argued either before or after Abassi that those cases give rise to special factors. Now, of course, the list of things that can create special factors, as Abassi explained, is non-exhaustive. And so the court really needs to consider the full picture. It makes a difference if the FBI agent is there, in Justice Breyer's hypothetical, to protect national security, to go after a guy with a bomb. And it makes a difference if you're trying to prevent the entry of drugs or illegal persons at the border. But in that sort of routine, run-of-the-mill, Fourth Amendment case by an FBI agent, we don't see special factors that count. It's a special factor if drugs are involved? Well, no, I'm sorry, Your Honor, not just the drugs. Drugs were, of course, the basis for the investigation in Bivens itself. But it's a special factor if you are protecting the border because it's a special factor any time the agent's statutory mission is to protect national security. And the court has explained that effective protection of the border implicates directly national security. Mr. Houston, if I understand your response to the Chief Justice, cases identical to Bivens the government concedes, and the three cases we've recognized, are permissible. But anything beyond that, we're going to have to do special factors. Is that a fair characterization? Yes, it is, Your Honor. And I would just like to say one word about why I think that's the right way to approach it. That's because I think step one of the two-step analysis is really just designed to perform a quick check to make sure that there are or are not special factors. And it's really at the step two that the court performs the full analysis. And you can see this in both the application of the test in Abbasi and Hernandez, where the discussion of whether the context was new was very, very brief. Most of the analytical work was being done at step two on special factors. Which is why you think it was appropriate for the Ninth Circuit to go to step two in this case? Absolutely. We think these contexts are clearly new, both of them, Your Honor. But we also, of course, respectfully disagree with the Ninth Circuit's conclusion that there are not special factors in this case. When you get to step two, can you imagine a case where it would ever be the situation where the special factors would not apply? Yes, I think it's the answer. What would be an example? I think it's the answer I gave to the Chief Justice. In a routine domestic search and seizure context or an excessive force claim involving a U.S. citizen by an FBI agent, that passes step one. It's a new context because that agent has a different mission than the agent in Bivens. But we would not argue that there are special factors, counseling, hesitation, unless the case has facts like it implicates national security or something like that. Mr. Houston, can I ask a question about the government's position on the level of generality at which we analyze new contexts? So you've gotten a lot of questions about, well, would this count? Would that count? Would it be the position of the United States that after Abbasi, we should construe the new context against recognizing so that we would expect a very, very close fit? Maybe not the Tuesday, Thursday, Monday, Wednesday examples that Justice Breyer was giving you. But is it the position of the United States that essentially the court has said that Bivens remedies are so disfavored that we should always err on the side of narrowness? Is that the position of the United States? I think that's basically right, Your Honor. I think it falls directly from the court's statements in Abbasi that a new context is broad and that even a minor extension still qualifies as an extension. But I actually think the skepticism of Bivens is just as important at step two. We think that the institutional competence of the courts, the fact that creating a cause of action is fundamentally a legislative function, not an exercise of the judicial power, mean that any extension of Bivens is disfavored. And thus, when the court is conducting a step two analysis, it should be quite skeptical before it recognizes new Bivens causes of action. Yes, but that wasn't quite the question I thought that you were asking, Justice Barrett. You were saying, all right, we see a new factor or could be a new factor. Should we approach it with skepticism as to whether it is a new factor or not? Now, there, why is skepticism justified? It can't be because it isn't a new factor. It falls within what has already been recognized as something that Congress either wanted or at least permitted. The reason I ask that is Justice Harlan's opinion in Bivens, which I think is interesting, traces Bivens the right for a court to have such a rule way, way back. Back to really the common law, back to England, back to and to John Marshall in. And so what's the reason? And John Marshall and Marbury versus Madison rights and remedies and so forth. So I got your point. Don't extend it. But I haven't got to the point of whether we consider the differences here. In this case, something that would be extending it or not to recognize it would be narrowing it. How do we do that? And why favor the one? Why have the presumption one way rather than the other? That's a little elaboration of what I said. The court has said that its conception of what makes something a new Bivens context is broad and that even a modest extension is still an extension. And the reason for that is because Justice Harlan's concurring opinion in Bivens and the great Chief Justice's opinion were referring to common law remedies for common law injuries. And that's very different, as this court has explained, from a federal court, which, of course, doesn't create general common law. Thank you, counsel. Justice Thomas. Anything further, Justice Breyer? Justice Alito. Justice Gorsuch. Justice Barrett. Thank you, counsel. Ms. Ellsworth. Mr. Chief Justice, and may it please the court, Mr. Boulay's Fourth Amendment claim is materially indistinguishable from Bivens itself. A federal law enforcement agent entered private property without a warrant and used excessive force, just like the federal agents in Bivens, as the court's questions have indicated. The fact that the federal agent inquired about the visa status of Mr. Boulay's guest in the process does not make this case any different from the other instances of law enforcement overreach in the search-and-seizure context in which this court has long recognized that a Bivens remedy lies. And this case has none of the foreign policy or extraterritoriality concerns that animated the court's decision in Hernandez. Instead, this is a case, like the court observed in Abbasi, where Bivens has continuing force and even necessity. Mr. Boulay's First Amendment claim addresses conduct that is similar to the conduct that this court assumed in Hartman v. Moore could be remedied via Bivens. But even if it is a new context, there is no reason to withhold the remedy here. There is no national security considerations, no conceivable national security considerations with regard to the First Amendment claim, and no alternative administrative remedial scheme that exists. Awarding damages for federal officer, individual damages for federal officer misconduct has long-standing roots, dating back to the founding, and remains appropriate, albeit more limited, today. And as the court has observed on several occasions, Congress in the Westfall Act preserved the availability of individual damages for constitutional violations. Although the reach of Bivens may be narrow, the need for the remedy persists, and the argument that the court should not recognize a Bivens remedy in any new case flies in the face of this court's decision just five terms ago in Abbasi, and also would contravene the historical foundation, allowing individual damages to right a federal officer's constitutional wrong. Mr. Boulay's case claims satisfy the framework set forth in Abbasi and should be allowed to proceed. I'd welcome the court's questions. But aren't you up against the fact that we have declined to apply or extend Bivens in recent history? We've almost universally declined to expand it into new context. That's correct, Justice Thomas, and we don't think this is a new context for all the reasons that some of the court's questions of my friend indicated. This is an unlawful entry without a warrant, and this is excessive force on private property against a U.S. citizen on domestic soil. None of the reasons that the court has found would be a Bivens extension in any prior cases apply here. And even if the court were to go to the next step, none of the reasons that have been offered that might counsel hesitation would be a reason to withhold a Bivens remedy here or to think that Congress would not want a damages remedy in this instance. What about Mr. Houston's reference to Canada and the cooperation with Canada? And so this is the border context, and it's not just near the border, but there actually is interaction with the Canadian authorities on this kind of activity. So a couple of responses to that, Justice Kavanaugh. First of all, I hear the government and petitioner to be saying that the actual proximity to the border doesn't matter to the position here. That, in fact, the position is that Border Patrol agents writ large should not be subjected to Bivens. I don't think this actual proximity and the cooperation with Canada is particularly relevant here. Agent Egbert would take the position that this conduct is not subject to Bivens if it happened 20 miles away because of the immigration-related context that supposedly applies. And that, to Justice Breyer's questions, the 83 agencies, the 5,500-mile land border with Canada, the idea that Bivens doesn't apply anywhere in that sloth would sweep with far too broad a brush. I think it is possible, and the court's decision in Hernandez, of course, recognizes this, that there are certain functions that may be performed by Border Patrol agents, which may create a new context or may be a reasoned counseling hesitation. But not every function performed by a Border Patrol agent falls into that category, and the conduct of Agent Egbert here certainly does not. Ms. Ellsworth, what if this had happened, you know, smugglers in was very, very close to the border? What if this exact same encounter at which Willow alleges there was excessive force had happened, not on his property, but right next to the border? Flip that. As a factual matter, his property is right next to the border. What if we push it up, like, right, right by the border? It's not his driveway. It's right, right by the border. Does that change things for you? I don't think it does, Your Honor. I really don't, because the conduct that the agent was engaged in here was ordinary law enforcement conduct. He was following up on a tip given to him by Mr. Boulay to come and inquire about the, or talk to this Turkish guest. And once he followed up on that tip, if you look at Joint Appendix 108, the agent left. There was no further concern, no further sort of exigency at the moment. So I don't think the proximity to the border makes a difference. So what would he have to do for Bivens not to apply? I mean, you know, Bull has been involved in smuggling activity in the past. His B&B has called smugglers in. His license plate says smuggler. You know, there's this Turkish national who's saying, and there's suspicion that he's going to, which in fact he did, cross the border into Canada illegally. And this is what Agent Egbert is following up on. What would have to be present? Can you give me a set of facts in which Bivens then would not apply? Certainly, and I think it's the Hernandez case, at least as one example. It's actively patrolling the border, attempting to prevent illegal entry, right? That's what Agent Maso is doing in Hernandez. That is one of the factors that the court found convincing as to why Bivens shouldn't apply there. Although the extraterritoriality and the foreign relations concerns played a far larger role, at least in the court's opinion. What I find so strange about this case is that Mr. Boulay is the one who told the agent about this visitor, didn't he? That's correct, Justice Sotomayor. Mr. Boulay was a government informant for ICE. Assuming that that's public knowledge now. And I think that Mr. Boulay told him he was coming from an airport, correct? That's correct. He told him he had flown into the country at Kennedy Airport in New York and was arriving in the area at Seattle-Tacoma. All right. I still don't understand why the agent had to wait until the car got to the inn, why he couldn't, if he was curious, have stopped the car anywhere. Well, that's exactly right, Justice Sotomayor. He could have stopped the car outside of the property. He could have stopped the car on the way from the airport. As Justice Barrett's question indicated, the car has a distinctive license plate. Agent Egbert was familiar with it. There was no need to enter the property in order to conduct the visa check. So I guess your answer is really that whatever the writ large activity of an agent is, we should be looking at what the activity was in this case. I think the specific activity is something the court has typically considered in the Bivens context in order to- Exactly. It has nothing to do with alleged smuggling. And of course, as I noted, Mr. Boulay was cooperating with the government rather than in opposition to it. But if the fact that the agent is conducting a visa check is sufficient to remove the conduct from the ambit of Bivens altogether, that would have extremely broad implications, far beyond border patrol. What if it happened right at the border? Suppose that someone runs across the border carrying a big bag of drugs and the border patrol agent sees that person and then tackles the person and allegedly uses excessive force in detaining the person. What would you say about that? That case would be much more similar to the conduct in Hernandez. And again, the agent would be actively both stationed at the border, stationed at a checkpoint of some sort, but also attempting to prevent illegal entry. If we're talking about the law enforcement conduct, that is one of the differences between what Agent Mesa was doing in Hernandez and Agent Egbert. How about if it's the other way? This person is running toward Canada and the border patrol agent tackles the person two feet from the Canadian border. Again, I think it would depend on whether the agent was actually stationed at the border attempting to prevent unlawful entry and exit. That's not the circumstance here. But I think that would be a closer case because, again, that is an individual border patrol agent who's actively engaged in trying to stop cross-border conduct, crime, whatever you call it. That's very different from a law enforcement officer who comes onto somebody's property, following up on a tip, and then, as the allegations of the case reach this court, engages in excessive force. It's a different... At what point do you think he, and this is not the Bivens question, but just to understand the background of this, at what point do you claim the agent violated your client's Fourth Amendment rights? This is a public accommodation, right? So presumably anybody can walk up to the door of it. Wouldn't that be the case? The district court found at the Petition Appendix 65A that the area where Agent Egbert attempted to question the Turkish guest, where he was standing and where Mr. Boulay asked him to leave, was the curtilage of the property, which is protected within the Fourth Amendment. It is an area very similar to the area that the court found in the Collins v. Virginia case was curtilage protected by the Fourth Amendment as well. The initial Fourth Amendment violation is that area, the fenced-in area right in front of the front door of Mr. Boulay's home, which is also... ...the biggest Fourth Amendment case that we've ever seen. So let me give a few responses, Justice Alito. First of all, the district court found that this was curtilage that was not disturbed on appeal by the Ninth Circuit, so I don't think that question is before the court. But I don't know if the issue is whether it's curtilage or not, because it's a commercial establishment, but go ahead. Taking the question, when Agent Egbert was in this area of the property and Mr. Boulay asked him to leave, that is the moment at which this became an unlawful search. Can I take you back to Justice Kavanaugh's question about U.S.-Canada relations? And as I understood it, the way you responded to him is, look, Petitioner's view would extend far beyond the border just any time a Border Patrol agent is involved. But how about if we narrowed Petitioner's view and we said, okay, it's Border Patrol agents acting near the border. Does that have implications almost as a matter of necessity for U.S.-Canada relations? I don't think it does as a matter of necessity. It's going to depend on the facts, because not all Border Patrol agents are engaged in conduct that is actively protecting the border at all times. The mission of the Border Patrol is much broader than that, and there are Border Patrol agents who at various times, as Justice Breyer's question to my friend indicated, are engaged in normal domestic law enforcement activity. So it depends on the activity that the agent is involved in. And I would just note... And why does this activity fall on one side of the line rather than the other side of the line? Because, again, the agent was following up on a tip. That's normal law enforcement activity. The fact that the tip... But doesn't it make a difference what the tip was about? Well, and the fact that the tip related to... First of all, the tip was, I have somebody who's legally in the country coming to my property, so there's some factual dispute here or lack of clarity that would need to be decided by a fact finder. As Your Honor noted, this comes to the court on summary judgment. But more importantly, if immigration-related, if following up on somebody's immigration status were sufficient to remove conduct from the ambit of Bivens, that sweeps every federal agent, that sweeps local agents, state agents. I mean, immigration checks are something that are extremely... But here, it's a tip, to follow up on Justice Kagan's questions, a tip about someone who's present in the officer exercising experience says, well, this person staying there is likely to cross the border or possible to cross the border into Canada. So it's an illegal crossing, although in the opposite direction of the cases that the Border Patrol is usually dealing with, and that goes back to the Canada-US cooperation. So it's not just an illegal presence case, it seems to me, from the officer's perspective. It's an illegal crossing investigation or potential illegal crossing. So a few responses to that, Justice Kavanaugh. First of all, the record belies that claim, right? At Joint Appendix 108, the agent came. Once he had checked the visa, he said our job there was done as Border Patrol agents and left. The second point I would make is, unlike in Hernandez, we do not have the government of Canada before this court indicating that they disagree with the position taken by the lower courts or the position taken by the agency. And the foreign relations animating factor in Hernandez, at least as I read it, related to the problem with foreign relations that it would create for a court, this court, to somehow contradict the judgment that the executive had made. But the third point I would make is... The government of Mexico did not object to having that suit go forward. No, the government of Mexico, of course, as the court is well aware, was supporting the availability of Bivens, but that would have been in contravention of the executive's decision not to discipline Officer Mesa. I think it's obviously true that Prime Minister Trudeau is not sitting up late thinking about this case, but is that what's required? Something more than the fact of it being proximate to Canada, I think, has to be required for this court to think that foreign relations somehow come into play. And there's no suggestion, even the government's representation at argument today, that there's any interest by the government of Canada in this particular case or in the conduct that Agent Egbert was involved in somehow being remedied or not remedied. And if it were sufficient that Agent Egbert is a Customs and Border Protection officer for that to eliminate the availability of Bivens, none of this court's discussion in Hernandez would have been necessary. Agent Mesa was a CBP officer as well, and the court went to great lengths to explain why it was that Bivens was not available there. It certainly wasn't sufficient either that he was affiliated with CBP or even that the conduct in question was so close to the border. There were many more considerations that the court took into account. I think it's important to keep in mind why we're asking all these questions about the border. And I think we may have missed this sort of important context. It's not whether we think there's going to be some connection to international affairs, but whether Congress, given that context, would want there to be a private right of action against the federal officer, but not enough to say something about it. In other words, I wonder if your friend on the other side is doing a little bit of double counting. We start by saying there has to be special considerations, but isn't one of the special considerations the likelihood that Congress would want their agents to be facing this type of liability? Whether it's something that's going to present a problem at the border in every case or not. Well, let's talk about what Congress has said here. We have two indications to the extent that we can read anything into them of what Congress thinks about this. The first is Section 1357G8, which subjects state officers who are deputized as CBP officers to the same types of liability and the same types of immunity as it would be under federal law. So that's a suggestion by Congress in understanding that there may well be civil suits that arise out of conduct like this. The second indication that we have is the Westfall Act, which of course doesn't speak to the border context, but it does speak to the fact that Congress has not seen fit to eliminate the remedy of individual damages against constitutional violations for federal officers. Well, then the argument on the other side is that's your alternative remedy, the Westfall Act. You don't need a Bivens action. If the FTCA were sufficient to be an alternative remedy, first of all, that would contravene this court's guidance in Carlson and Malesko about the FTCA and Bivens meaning to coexist. But the second point I would make is the Westfall Act explicitly exempts Bivens actions. That's what the court said in Huey v. Castaneda. And the Westfall Act was enacted against the backdrop of this court's Bivens jurisprudence at least as it existed in 1988, which was respectfully far broader than it is today. So to the extent we can read anything into what Congress has done in the Westfall Act, I think it certainly doesn't counsel against a Bivens remedy in this case in the Fourth Amendment context. Counsel, if I understand you correctly, you disagree with the Ninth Circuit at the first step. Is that right? The Ninth Circuit said this is a new context, and you say it is not a new context because the actions of the officers here are pretty similar to those in Bivens. That's correct. The Ninth Circuit found this to be a modest extension. Respectfully, we submit that it's not an extension of Bivens, and so the special factors don't need to be considered. So I guess, you know, part of my – here's my big concern. I'll lay it out. We have a disagreement about the level of generality we're supposed to apply at step one, whether this is or isn't a new context. And one side argues that we should look at it more broadly, perhaps you. This is more like Bivens at a high level of generality. The other side tells us we have to get down to the nitty-gritty. And any deviation from any specific thing is enough to create special factors. And then we go to the special factors, and it's a whole list of disparate considerations that are pretty hard to balance, I think. We could all agree. And we're told that really the agency matters, but on the other side we're told, no, it's the conduct that matters in a specific case. And in between, it could be the conduct that could potentially matter in those circumstances that an officer entering might face. It could be a law enforcement call that turns into an immigration call, or an immigration call that turns into a law enforcement call. And then we talk about the border. And there we know that if it's a shot across the border, that's bad. But the smugglers' inn, which has been disparaged in its quality today, unfairly I'm sure, is sufficiently far from the border that it's okay. And then we had a series of hypotheticals about, well, what if the driveway were a little closer? Or whatever. And I guess I'm just stuck. What is a good and faithful judge supposed to try and do with all of this mess? Acknowledging the fact, too, that this court hasn't recognized the New Bivens Action in decades. As you say, the law was very different in 1988 than it is today. Help. So let me do my best, Justice Gorsuch. I think that the court should look to the guidance in Abbasi from five terms ago. And I know that Hernandez is an intervening case, but I think Hernandez is almost sui generis, given the facts of that case. And if the court looks at Abbasi, the framework that was set out in Abbasi provides the court guidance for what to consider and how to weigh that. And in fact, one of the claims in Abbasi against the individual jailers, as the court is aware, was sent back to the Second Circuit to consider whether special factors counsel hesitation. So the court did, in fact, recognize a new context in Abbasi. It found that because the conditions of confinement claim was brought under the Fifth Amendment rather than the Eighth Amendment, that was a new context, a modest extension, and sent it back to the Second Circuit for consideration. Now, in the interest of candor, the District Court found that, in fact, there were special factors counseling hesitation in that case. But the fact remains that the framework that was set forth in Abbasi, I think, allows the courts to consider and weigh these different competing factors in the way that courts do every day in the qualified immunity context, in applying the exclusionary rule, in various other factors. You know, in those contexts, to take qualified immunity, I kind of get my head around at least what I'm supposed to try to do there, right? Is the law clearly established? And I look on the books and see if I can find it. Here, we can't even agree on step one whether this is a new... I mean, how many years on from Bivens we can't even agree what a new context is? Well, and then when we get to special factors, I mean, I think as our discussion today has illuminated, it isn't exactly like looking on the books to see if there's a case on point. And I would say that the lower courts have not respectfully struggled to quite the same degree with applying the Abbasi framework. There have been, and they're cited in all the briefs, there have been cases since Abbasi where lower courts have concluded that a Fourth Amendment on lawful search and seizure, like we submit this case, is not a new context in that Bivens applies. And there have been many other cases where the court has concluded either it's a new context or that special factors apply. Except for you argue on that first one that the Ninth Circuit's wrong, that this isn't a new context, right? I mean, you say, well, the lower courts have had no problem finding this isn't a new context, except for this one did. Well, the Sixth Circuit in the case cited in our brief at page 31 found no new context in a Fourth Amendment. So we have a disagreement between the Sixth and the Ninth Circuit on whether this is a new context? Well, there's obviously different cases, but I don't think that, I mean, I think the court can also consider the same factors that the court considers in determining whether something is a new context. They seem to bleed over into the special factors as well. Either way you slice them here, I don't think... When we have a two-step test, we have two steps. And here's kind of, as you say, one and a half. Well, in either way, whether the court considers it under Step 1 or the court considers it under Step 2, none of the factors that were outlined in Abbasi, nor any other factors that have been raised by either the United States or Petitioner, are a reason why this Fourth Amendment claim should not be allowed to proceed. Ms. Salazar, let me ask you a question, the questions following up that Justice Breyer and I were asking about skepticism. And given that the court hasn't recognized a new Bivens claim in decades, given that the court has said that they're disfavored, when we're asking these questions about level of generality and going through the factors, do you think our precedent puts a thumb on the scale of skepticism and a thumb on the scale of counseling the court to treat it as a new context? I don't think the... I don't think the... I think it's fair to say that the court has treated Bivens claims with skepticism over the past several decades. That is certainly fair. The... I don't think the court has put a thumb on the scale in favor of finding a new context, per se. And like I said, in Abbasi, the court... No, in favor of not finding a new context. In favor of not finding a new context, yes. I think what the court has done has been appropriately guarded in expanding the remedy of Bivens beyond where it has already been recognized. And of course, it has been recognized time and again, not just in Bivens, but in Wilson v. Lane and in other cases in the Fourth Amendment. In those contexts, we would say, okay, fair application of Bivens means this is exactly the same, but we don't have to have any skepticism when we're considering the factors about extending it into new areas. We're just kind of faithfully applying it like we would any other precedent, rather than trying to narrow it. I think the court has already narrowed Bivens substantially, and I don't read the court's more recent decisions as attempting to further narrow it, but rather attempting to determine how to fit individual cases within the framework that has been set forth. And of course, this two-step framework that we're talking about really was only announced in its current form in the Abbasi case five years ago. Prior to that, alternative remedies were playing a larger role in the court's determination of whether Bivens was available. So do I read you right in saying something like, look, what Bivens has become is basically a remedy for Fourth Amendment violations, and whatever skepticism you might have outside of that context, I mean, I guess there are a couple of other contexts, right, but the bulk of Bivens claims or Fourth Amendment claims, whatever skepticism you might have outside of that, it's inappropriate to amend. I think that's correct, Your Honor, and that's certainly what courts have called the core or heartland of Bivens is what this court in Abbasi recognized was the area in which Bivens had continuing force and necessity, and so the Fourth Amendment claim seems much less difficult. That makes your First Amendment claim a lot more difficult. The First Amendment claim is an uphill battle, Your Honor. The First Amendment claim was found to be a new context by the Ninth Circuit. The Hartman v. Moore case did not hold that Bivens was available in the First Amendment context, but it did, of course, state that when the vengeful officer is federal, a Bivens remedy lies, whether that amounts to recognizing a Bivens claim or not. The idea that special factors counsel hesitation in the First Amendment context, we think, is not appropriate in this case or not appropriate in the narrow type of First Amendment retaliation claim that Mr. Boulay is bringing here. This is not a retaliation claim that relates to malicious prosecution or to arrest or to anything else that's within, as the Ninth Circuit put it, the scope of the official duties of the officer. What we have here is Agent Egbert calling and sending a publicly available news article to these other agencies with, we allege, retaliatory motive in retaliation for Mr. Boulay's complaints to supervisors about the conduct on March 20, 2014. That's the type of retaliation this Court has called straightforward in terms of issues of causation. And while it may be an extension of Bivens to recognize the First Amendment claim, it is not one in which there are any special factors that counsel hesitation. There's no national security concerns. There's no administrative regime that could be available to Mr. Boulay to otherwise press these claims. The state law claims that both the petitioner and the United States have suggested would be available to Mr. Boulay are not available, again, because of the Westfall Act, because the conduct, while it is not part of its official duties, would fall outside his scope of employment for purposes of Washington law, which is where this Court looks. And the FTCA is, while it may be an alternative remedy in some senses, it is not an exclusive remedy to Bivens. Mr. Boulay also was not able to actually bring his First Amendment claims under the FTCA for time-barred reasons. But putting that to the side, the FTCA and Bivens continue to coexist, and so that's not a reason why the First Amendment claim should not be recognized here. On the Fourth Amendment front, how should we properly handle invocations of national security by the government? Well, I would remind the Court that the government didn't see fit to invoke national security or participate in this case until it reached this Court. So the government did not participate in the Ninth Circuit or the District Court and suggest that there were some national security concerns attendant to this claim against a Border Patrol officer. But I think what the Court should consider is whether the specific type of claim that would be recognized, which again here is going to be a garden-variety search-and-seizure claim on private property against a U.S. citizen, but whether there's some national security considerations that are attendant to that, and there are none. The only national security considerations that have been invoked are the fact that Agent Egbert is affiliated with the Border Patrol. That's not sufficient. There may be some Border Patrol functions that do implicate national security. In fact, surely there are, but this is not one of them. Do you think it matters, and do I understand your last answer to mean that it matters what a particular Border Patrol agent's usual duties are, as opposed to what the Border Patrol agent is doing at the time of the alleged tort? I think it's the latter, Justice Alito. I think it's the conduct that the agent is involved in at the time. Well, so here he's following up on a call from your client about somebody. Why did your client call the agent about this individual? Actually, Agent Egbert had stopped Mr. Boulay. He performed a vehicle stop on the road earlier that morning, and during the course of that stop, Mr. Boulay informed Agent Egbert that there would be somebody arriving in that evening. And why did he inform him of that? That is not clear from the record. That's the type of factual development that we would hope to have the opportunity to develop at trial. I mean, if he knew that one of us was going to check into the smugglers' inn, and he happened to be stopped by a Border Patrol agent, well, he would say, well, by the way, or let's maybe... Suspicious character. Any ordinary person that was checking into the smugglers' inn, he would have told the agent? I don't have the answer to that, Justice Alito. I mean, I think it's important to keep in mind... And did he tell him that his employees had driven all the way to Seattle to pick up this person and drive the person back for a two-hour drive? Yes, that is, in fact, typically one of the services that Mr. Boulay provided was to pick people up at the airport. Everybody who checks into the smugglers' inn, he does that? I don't know if it's an add-on or if it's part of the rate, Your Honor. But Mr. Boulay, of course, is working with the government, previously with CBP, and at the time of the incident in question, he was working with Immigration and Customs Enforcement. So whether that's the reason for him having informed Agent Egbert of this or not, I don't have the answer to. But the fact of the matter is, having a government informant tell an officer that somebody is arriving legally in the country, I just don't think it's reasonable to consider that to be some reasonable suspicion to come onto the property. But I don't think the court needs to delve into those details and certainly needn't weigh them. The question is whether this type of function, coming to check on the visa status, on private property, on U.S. soil... It's very close. It's maybe 20 feet. It's not far at all from the border. Mr. Boulay's property actually crosses over. 20 feet? The proximity to the border is not an addition to make sure that the court is clear. We are not arguing that this is somehow far enough from the border that it doesn't implicate the actual line. The issue here is that the conduct that the agent was involved in has nothing to do with trying to prevent people from crossing over to the United States or even from trying to leave the United States. Why do you say that? Because the conduct that the agent was involved in was following up to ask a question about the visa status of this individual. He's not trying to attempt to stop people from crossing into the country when he went onto Mr. Boulay's property to ask these questions. As I understand it, the government is now suggesting that that is what they were concerned with. It seems as though there's just a difference in one's view of the facts here. Is that correct? I come to this court with a record that I have. Joint Appendix 108 is Agent Egbert's own declaration indicating that after he checked the guest's visa status, there was nothing more for him to do as a Border Patrol agent and he left. This may be the same question I tried to ask earlier, but I've given it a little more thought so I might be able to phrase it better. We've been talking about does this agent in this case have something to do with the border? Is it affected in some way? And the idea, I guess, is if it is, maybe there shouldn't be a Bivens action. But if there isn't, maybe there should be. But the context is sort of we're stepping into the authority that would normally be vested in Congress in terms of whether or not to provide a cause of action. And if Congress were sitting down saying should there be a cause of action, it's not going to be parsing the particular facts. Well, there should be a cause of action if this, this, and this. Presumably they would say Border Patrol agents are not liable for actions on the part of this or something like that. And shouldn't we take that into account and not be so terribly concerned about the particular facts but more what Congress would think about the consequences for its border agents and whether it would draw a particular line on that basis? Let me try and answer that question in a few different ways. The first is that what the court would be doing here were it to recognize, affirm the Ninth Circuit and recognize the availability of Bivens would be to find that this conduct falls within a cause of action that the court has already implied in Bivens in the Fourth Amendment context to go to Justice Kagan's point. So I don't think that the court would be involved in that form of implying a cause of action here because it would fit within the conduct of Bivens. But Congress has not, there's no suggestion in the statutory background here that Congress has made any statements that suggest that it does not view Border Patrol agents as being susceptible to Bivens or would have concerns here. And I don't think the court would need to engage in the type of weighing that your question suggests in order to determine that this conduct, which we can make it a higher level of generality, following up on a tip, going onto private property, questioning an individual, and using excessive force allegedly. All of those, that's all conduct that the court is able to weigh and judge and weighs and judges in a variety of different cases. And it's not, wouldn't require the sort of line drawing that I think some of the factual questions have suggested. And the idea that the Border Patrol writ large can't be subjected to a Bivens action, not only would it sweep very broadly, but it's also contrary to the court's decision in Hernandez and some other lower courts decisions that have allowed Bivens cases to go forward against Border Patrol agents, Immigration and Customs Enforcement agents, and other agents who are involved in either border security or immigration related matters. So long as there's not a national security reason to hesitate, which in this case, there's not. Thank you. Anything further? Thank you, counsel. Thank you, Mr. Chief Justice. Rebuttal Ms. Harris. Thank you, Mr. Chief Justice. Three quick points. First of all, there's been a lot of debate about how to define a new context and what is new in this context. I think one of the questions is what is the heartland of Bivens? Is it really any time a law enforcement officer happens to be performing regular law enforcement duties or it's something else? I do think that that is not quite presented here because the actual duties of whether you look at the Border Patrol or what Agent Egbert is acting under are specific statutory authorities for the Border Patrol involving immigration enforcement, illegal entry and exit. That's 6 USC 211 and 8 USC 1357. We are not talking about the boundaries of figuring out what did the court mean in Abbasi by the context in which there would not be new extensions of Bivens. So I think a lot of that debate just depends on what happens when you do have a Bivens extension, and I think that is the case. And the second point I'd like to make is how broadly should the court be looking at the officer's functions or the facts on the ground? And I think there really is a contrast between our positions. As perhaps the chief's most recent question indicates, I don't think it's right to think that Congress would be looking at the granular details of whether Agent Egbert should have stopped someone 50 meters from the smugglers in or at the smugglers in driveway or perhaps on the road up to the smugglers in. I think the question that this court's cases have looked at, and Hernandez is a particularly good example, is what is the type of conduct that the officer is engaged in? It's not Agent Mesa and Hernandez engaged in a purportedly unjustified cross-border killing of a teenager. It is situations where Border Patrol agents might be needing to use force, or here, situations in which Border Patrol agents are conceitedly performing immigration functions. I think that has to be right, because if you were to allow a Bivens claim in this context, you would be having the prospect of liability hang over officers' heads, and they need to know sort of not just, you know, if you visit the smugglers, then you'll be subject to Bivens liability. But more broadly, if you are engaged in an immigration search and you have to use force, what are the contours of your liability going to look like? And then, zooming out even further, courts have to ask, I think, under About Me and Hernandez, what are the costs of that going to be for the Border Patrol? What are the litigation costs? What are the systemic costs going to look like? What's the deterrent effect on top of all of the other remedies that are out there for dealing with this type of conduct, including the internal investigations Congress has mandated? So I think that really is the right level of generality. And one confirmation of that is that courts of appeals, other than the Ninth Circuit, have indeed suggested that immigration enforcement and the conduct of agents at the border are always going to be special factors because they are so intimately tied to national security and immigration functions. And those are two things that have always been entrusted particularly to the political branches. And the fact that courts of appeals have been saying that, other than the Ninth Circuit, I think also gives some comfort that that is a workable rule. It has not produced bad consequences in those circuits. And those are three circuits, the Fifth, the Sixth, and the Eleventh, that have said that now for at least several years. So I think that should give some additional comfort. And just one third point, which is that the seat of play now is there are 60 cases in the courts of appeals after About Me, only two extensions from the Ninth Circuit. I think that strongly suggests that time for Bivens extensions may have been done. Thank you. Thank you, counsel. The case is submitted.